**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:  1:17-cv-00631-RM-MEH

GEORGINA SANTICH, et al.,

      Plaintiffs,

v.

VCG HOLDING CORP, et al.,

      Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO STAY OR DISMISS
PROCEEDINGS**

---

In a desperate effort to avoid the application of the numerous arbitration provisions they agreed to time and again, Plaintiffs make the unbelievable claims that they were rushed through the process, were intoxicated, or wearing clothing that made them feel intimidated. Yet, only 12 of the 35 named Plaintiffs have submitted any evidence whatsoever to support such claims, and therefore 23 of them should be immediately compelled to arbitration. The remaining Plaintiffs should also be compelled to arbitration. As an initial matter, Plaintiffs' unconscionability challenges relate to the formation of their lease agreements as a whole, not simply the arbitration provisions. This means that an arbitrator, not the Court, must determine whether their claims are arbitrable under binding Supreme Court precedent.   In any event, Plaintiffs' self-serving declarations do not show that they were *forced* to sign the agreements with arbitration clauses, *forced* to elect to perform as an independent contractor rather than an employee, or were so intoxicated that they did not know the difference. In reality, Plaintiffs are simply attempting to

avoid a provision of their agreement that they now dislike. Such approach has been routinely rejected by Courts in nearly identical circumstances.

Contrary to Plaintiffs' assertions in their introduction, whether or not the entertainers were properly classified hinges on how the relationship worked in practice. Courts have not universally determined that entertainers must be paid a minimum wage as opposed to enjoying their status as independent contractors. In reality, entertainers seek to perform as independent contractors so that they maintain their own schedule, can perform at competing clubs, keep their tips, and make more money. Provided they are treated as independent contractors and not employees, nothing in the FLSA prohibits such relationship. In fact, in a case factually similar case, the District Court in Arizona concluded that entertainers were in fact, independent contractors under the FLSA, not employees. *See Tijerino v. Stetson Desert Project LLC et al*., No. 2:15-cv-02563, ECF # 52 (D. Arizona, June 21, 2017)[1].  Exhibit A.

## I.      CHALLENGES TO AGREEMENTS ARE DECIDED BY THE ARBITRATOR

As an initial matter, *Granite Rock Co. v. Int'l Bhd. Of Teamsters,* 561 U.S. 287 (2010), specifically states that a court may order arbitration of a particular dispute where the parties agreed to arbitrate *that dispute. Id*., at 297.  Here, the parties agreed that the arbitrator would determine all issues of arbitrability: "The Arbitrator shall have exclusive authority to resolve any disputes over the formation, validity, interpretation and/or enforceability of any part of this lease, including these arbitration provisions." See [Dkts. 20-1–61, ¶ 21].  This is clear and unmistakable evidence

---

[1] See also, *Oregon v. Acropolis McLoughlin, Inc*., 945 P.2d 647 (Or. App. 1997), *Marlar, Inc. v. United States*, 151 F.3d 962 (9th Cir. 1998); *Matson v. 7455, Inc*., 2000 WL 1132110 (D. Or. Jan. 14, 2000); *Carla McKinney v. Chief Legal Counsel of the Department of Human Rights,* 811 N.E.2d 803 (Ill. App. 5th Dist. 2002); *Hilborn v. Prime Time Club, Inc*., 2012 WL 9187581 (E.D. Ark. July 12, 2012); *Sizemore v. Jezebel's, Inc*., 152 P.3d 689; 2007 WL 656444 (Kan. App. March 2, 2007).

that the parties intended to delegate questions of arbitrability to the arbitrator. *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2nd Cir. 2005) (when parties explicitly incorporate language that empowers an arbitrator to decide issues of arbitrability, the incorporation constitutes evidence of the parties' intent to delegate such issues to an arbitrator). A motion to stay proceedings pending the outcome of an arbitration decision is applicable where an issue arises in the course of litigation that is subject to the exclusive jurisdiction of the arbitrator. *Lamb v. GE Consumer & Indus.*, 2006 U.S. Dist. LEXIS 54082, at *6 n.3 (N.D. Ind. Aug. 2, 2006).

Moreover, Plaintiff's reliance on *Rent –A- Center, W., v. Jackson,* 561 U.S. 63 (2010) is unavailing. There, the Supreme Court noted that there are two types of validity challenges under Section 2 of the Federal Arbitration Act (FAA). The first is a challenge only to the validity of the arbitration agreement. *Id.,* at 63. The second is a challenge to the entire contract as a whole. *Id.* (citations omitted). Challenges to a contract as a whole that contain arbitration agreements are for the arbitrator to decide. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 (1967) (federal courts are not permitted to consider claims of fraud in the inducement of *a contract generally,* where the parties agreed to an arbitration clause) (emphasis added). "Attacks on the validity of an entire contract, as distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken" *Preston v. Ferrer,* 552 U.S. 346, 353 (2008); *see also, Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 538 (10th Cir. 1987); *Alwert v. Cox Communs., Inc. (In re Cox Enters., Inc. Set-Top Cable TV Box Antitrust Litig.)*, 835 F.3d 1195, 1210 (10th Cir. 2016).

Here, Plaintiffs' unconscionability arguments challenge the *entire lease agreement*, not just the arbitration provision. Plaintiffs' challenges are nearly identical to those in *McGrew v. VCG Holding Corp.* 2017 U.S. Dist. LEXIS 43963. *See* Ex. B. There, the court held that plaintiffs

challenged the unconscionability of the *entire lease agreements* and not just the arbitration clause where the Plaintiffs alleged they were encouraged to drink on their shifts and were drunk when they signed the agreements, were not given enough time to review the agreements, and the agreements were contracts of adhesion. *Id.* at *21.  The court held there that the issues of unconscionability were for the arbitrator to decide.  Similarly here, Plaintiffs specifically challenge Defendants' alleged "strategy" of misclassifying the Plaintiffs, specifically challenging provisions "peppered" throughout the leases. [Dkt. 105 at p. 2].  Plaintiffs do not contend that they were encouraged to drink only when they were reviewing the arbitration clause, or that they had to be in their dance clothes and not their street clothes only when they were reviewing the arbitration clause. They do not allege, for example, that they had time to read through the majority of the lease agreement, but were rushed only through the arbitration clause.  Rather, just as in *McGrew*, Plaintiffs allege that their lease agreements are unconscionable *in their entirety* because of the circumstances surrounding their execution: that is for the arbitrator to decide.  *See McGrew*, 2017 U.S. Dist. LEXIS 43963 at *23.  Plaintiff's reliance on *Spahr v. Secco* is inapposite.  Unlike in *Spahr*, Plaintiffs do not claim that they were all so mentally incapacitated that they would be unable to assent to the entire agreement.[2]

---

[2] Plaintiffs have not presented any evidence that they are not mentally capable of contracting. Abbott, Axelson, Berry, Cline, Raffaele, and Rail are high school graduates and Shafer has her GED. Santich, Chavez, Wozneak, and Bonham are silent as to their level of education. Only Livingston avers that she did not graduate from high school. Yet even a cursory review of the declarants' respective declarations reveals none appear to have any trouble with complicated English language. In any event, Plaintiffs argument amounts to a claim that they simply lack mental capacity to contract. There is no evidence to support this overly paternalistic claim.

## II.   MOST (23) NAMED PLAINTIFFS HAVE NOT CHALLENGED THE MAKING OR VALIDITY OF THE AGREEMENTS OR SIGNED NEW CONTRACTS AND SHOULD BE IMMEDIATELY COMPELLED

Regardless of whether this Court or the arbitrator decides the issue of unconscionability (which only the arbitrator should), numerous Plaintiffs have not satisfied their burden of establishing that the lease agreements are unconscionable because they have not presented any evidence whatsoever with respect to the execution of their agreements. *Cook v. PenSa, Inc.*, 2014 U.S. Dist. LEXIS 106730, *22-23, 2014 WL 3809409 (D. Colo. Aug. 1, 2014) (The burden is on the Plaintiff to show that the contract is both procedurally and substantively unconscionable).

Only 12 Plaintiffs signed declarations to support the allegations which challenge the formation or making of the lease agreements. Remarkably, since then, and after counsel for Defendants in this very case sent copies of the new leases to Plaintiffs' counsel, three of the named Plaintiffs re-signed contracts containing a mandatory arbitration clause and class and collective action waivers.[3] As a result, the 23 Plaintiffs who did not provide any evidence with respect to their agreements, and the three who re-signed them after their declarations, should be immediately compelled to arbitration.

## III.   THE ARBITRATION CLAUSE IN THE LEASE IS NOT UNCONSCIONABLE

Courts handling contract disputes that apply Colorado law and start with the presumption that a contract clause is enforceable. *Bonanno v. Quizno's,* 2009 U.S. Dist. LEXIS 37702 (D. Colo. 2009). Plaintiffs cited *Davis v. M.L.G. Corp.,* 712 P.2d 985 (Colo. 1986) to establish that the there

---

[3] These are Adrianna Axelson (Decl. signed 4/2/17, Dkt. 106-3, new entertainer agreement signed May 27, 2017); Ariel Cline (Decl. signed 4/28/17, Dkt. 106-6; new entertainer agreement signed June 19, 2017); and Amanda Livingston (Decl. signed  5/5/17, ECF # 106-8; new entertainer agreement signed June 3, 2017). *See* Ex. B. Ex. C are DVD's containing recording the contracting process of these three entertainers. Ex. C are filed in the traditional manner. A copy of the Colorado lease was forwarded to Plaintiff's counsel so she could advise her clients about them on May 19, 2017. *See* Ex. E.

is evidence of some overreaching on the part of one of the parties as to make the agreement unconscionable. While Plaintiffs cited the factors from *Davis* regarding procedural unconscionability, they rely on cases outside the Tenth Circuit for the substantive unconscionability portion of their analysis. This is because Plaintiffs cannot show substantive unconscionability under the Colorado standard set forth in *Davis*, or the unconscionability analysis of Indiana or Maine law which applies to four of the agreements.[4]

In Colorado, the factors used to determine whether a contract is procedurally and substantively unconscionable include: 1) a standardized agreement executed by parties of unequal bargaining power; 2) lack of opportunity to read or become familiar with the document before signing it; 3) use of fine print in the portion of the contract containing the challenged provision; 4) absence of evidence that the provision was commercially reasonable or should have reasonably been anticipated; 5) the terms of the contract, including substantive unfairness; 6) the relationship

---

[4] Plaintiffs have submitted declarations for four Plaintiffs, Abbott, Rail, Shafer, and Wozneak who executed contracts and performed outside of Colorado. Abbott and Rail's contracts are subject to Indiana law. (See Dkt. 106-2 ¶ 20, Dkt. 106-9 ¶ 20;) Shafer and Wozneak are subject to Maine law. (Dkt. 106-10 ¶ 20, Dkt. 106-11, ¶ 20)

Under Indiana law, a contract is unconscionable if it is one that "no sensible man not under delusion, duress or in distress would make, and [one that] no honest and fair man would accept." *Feltner v. Bluegreen Corp.*, 2002 U.S. Dist. LEXIS 20449, *15, 2002 WL 31399106 (S.D. Ind. Oct. 8, 2002), citing, *Weaver v. Am. Oil Co.,* 257 Ind. 458, 276 N.E.2d 144, 146 (Ind. 1971). Further, recognition that an arbitration agreement in the employment context is an adhesion contract does not render it unconscionable. *Weaver* establishes that there must be a "gross" inequality between bargaining parties for a contract to be unconscionable. *Feltner*, supra, citing *Weaver*, 276 N.E.2d at 146. As the district court noted in *Abbott v. Lexford Apartment Servs., Inc.,* 2002 U.S. Dist. LEXIS 14746, 2002 WL 1800320 (S.D. Ind. Aug. 2, 2002).

Maine also recognizes "a broad presumption in favor of arbitration." *Brackett v. Gen. Dynamics Armament & Tech. Prods.*, 2010 U.S. Dist. LEXIS 64016, *4, 2010 WL 2628525 (D. Me. June 25, 2010), citing *Barrett v. McDonald Investments, Inc.*, 2005 ME 43, 870 A.2d 146, 149 (Me. 2005), including arbitration in the employment context. *Id.* Under Maine law, [u]nconscionability is considered through two lenses: procedural and substantive. *Blanchard v. Blanchard*, 2016 ME 140, P19, 2016 Me. LEXIS 155, *11 (Me. Sept. 6, 2016), (citations omitted) (Alexander, J., concurring). Procedural unconscionability is analyzed based on the circumstances that existed at the time the contract was adopted, *Id*, (citations omitted), and generally refers to the exploitation of unequal bargaining power between the parties, *see Am. Airlines v. Wolens*, 513 U.S. 219, 249, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995) "Substantive unconscionability or unfairness focuses on the terms of the agreement and whether those terms are so one-sided as to ***shock the conscience***." *Barrett*, 2005 ME 43, ¶ 36, 870 A.2d 146 (Alexander, J., concurring) (quotation marks omitted). *Id*,(citations omitted). Like the Plaintiffs in *Brackett,* Shafer and Wozneak fall well short of this standard.

of the parties, including factors of assent, unfair surprise, and notice; and 7) all of the circumstances surrounding the formation of the contract, including its commercial setting, purpose, and effect. *Davis,* 712 P.2d at 991. Factors one, two, three, six, and seven, are used to determine procedural unconscionability. *Vernon v. Qwest Communs. Int'l, Inc.,* 857 F. Supp. 2d 1135, 1158 (D. Colo. 2012). Factors four and five are used to assess substantive unfairness. *Id.* at 1157. In order to prove that a contract or provision of a contract is unconscionable, it has to be both procedurally *and* substantively unconscionable. The same holds true under Indiana and Maine law. *See Blanchard v. Blanchard*, 2016 ME 140, P19, 148 A.3d 277, 282-283, 2016 Me. LEXIS 155, *11 (Me. Sept. 6, 2016); *Weaver v. Am. Oil Co.,* 257 Ind. 458, 276 N.E.2d 144, 146 (Ind. 1971).

### B.    The Agreements are Not Unconscionable

Any testimony from the declarants regarding the first factor, that the agreement was standardized and the parties were of unequal bargaining power, is unavailing. Plaintiff Santich states that she was "not given any choice" but to sign the independent contractor agreement. [Dkt. 106-1, ¶ 4]. However, she does not allege that Defendants forced her to sign the agreement. This Court has held that little weight should be given to the first factor when Plaintiffs argue that "the adhesive nature of a contract (i.e. standardized forms, lack of ability to negotiate, power disadvantage, etc.) should render the arbitration provision of the contract unconscionable." *Bernal v. Burnett,* 793 F. Supp. 2d 1280, 1287 (D. Colo. 2011) (adhesion contracts are not inherently unconscionable regardless of lack of ability to negotiate or power disadvantages).[5] Pursuant to

---

[5] Plaintiffs continued to assent to the entertainer agreements by continuing to perform under it. A party may demonstrate assent to the terms of an offer either by promising to perform or by actually performing. *Vernon,* 857 F. Supp. 2d at 1149 (citations omitted). An objective manifestation of assent is not rebutted by that same party's uncommunicated, subjective intent. *Id.* Here, Plaintiffs continued to perform under the agreements, and most executed multiple agreements with Defendants. Thus, their performance thereunder amounts to assent, even if they were initially unconscionable.

*Bernal,* the allegations related to power disadvantages and the inability to negotiate should be given little weight in the unconscionability analysis.

Next, Plaintiffs claim that they did not have sufficient time to read or become familiar with the lease agreement. Santich states "a manager watched me impatiently to make me hurry up and sign." [Dkt. 106, Ex. 1, ¶¶ 4]. Other Plaintiffs said they were rushed because the managers appeared impatient. [Dkt. 106 - 2, ¶ 4; Dkt. 106-3, ¶¶ 11, 13; Dkt. 106-4, ¶¶ 6, 11, 13; Dkt. 106-5, ¶¶ 5, 11; Dkt. 106-7, ¶ 11; Dkt. 106-8, ¶ 4; Dkt. 106-9, ¶ 10; and Dkt. 106-10, ¶ 6]. Yet, none of the Plaintiffs described how much time the spent reviewing the contract, whether they asked for and were denied additional time to review the contract, or any additional information about the contract that they requested. Some admit they asked questions and had those questions answered. [Dkt. 106-.2, ¶ 4; Dkt. 106-4, ¶ 12; Dkt. 106-7, ¶ 11; Dkt. 106-9, ¶ 4; Dkt. 106-10, ¶ 6; and Dkt. 106-11, ¶ 5]. Even if Plaintiffs did not read the agreements, none of the declarants allege that there was any fraud or concealment, in the contract or on the part of the managers presenting it to them. [Dkt. 106-1-12]. "[A]bsent fraud or concealment, a person who signs a document is presumed to have knowledge of the document's contents, independent of whether that person has read the document." *Breaux v. American Family Mut. Ins. Co.,* 387 F. Supp. 2d 1154, 1162 (D. Colo. 2005) ("Plaintiff alleges no fraud or concealment and signed the waiver") (citation omitted). Additionally, Colorado law holds that a party cannot avoid contractual obligations by claiming that he or she did not read the terms of the agreement and it is presumed that one who signs the contract, understands it. *Vernon,* 857 F. Supp. 2d at 1151.

None of the declarants alleged the third factor – that the challenged provision was in fine print. It was not. While Santich claims she did not understand that she was "signing away," her

legal rights, and that no one explained the arbitration clause to her,  [Dkt. 106], Ex. 1, ¶6, she does not allege that she asked anyone about the arbitration provision, or that if she had understood the provision, that she would not have signed the agreement. In fact, none of them state that had they understood the arbitration provision they would not have signed it. [Dkt. 106-1, ¶ 6; Dkt. 106-2, ¶ 7; Dkt. 106-3 ¶¶ 8, 11; Dkt. 106-4 ¶¶ 8, 11; Dkt. 106-5, ¶ 7; Dkt. 106-6 ¶ 8; Dkt. 106-7, ¶ 7; Dkt. 106-8 ¶¶ 7, 8, 10; Dkt. 106-9, ¶ 7; Dkt. 106-12 ¶ 6]. *See Holden v. Raleigh Rest. Concepts, Inc.*, 2014 U.S. Dist. LEXIS 163676 (E.D.N.C. 2014) (finding arbitration provision not unconscionable where the "arbitrator provision is prominently displayed in bold and capitalized font). Ex. F.

Plaintiffs also do not allege the fourth factor, that the provision was commercially unreasonable or that it was not reasonably anticipated. Santich signed at least 9 agreements over the course of several years. Additionally, all of Santich's lease agreements (and all other declarants' agreements) were substantially similar, each containing an arbitration provision with a class action wavier. Ex. G.  Moreover, under Colorado law, a clause precluding the pursuit of relief on a class-wide basis or limiting their claims to arbitration is not unconscionable or commercially unreasonable. *Vernon,* 857 F. Supp. 2d at 58 (the inclusion of a class-action waiver in an arbitration provision does not make the provision unconscionable); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Ex. W*, ___ U.S. ___, 137 S. Ct. 1421, 1426, 197 L. Ed. 2d 806, 812,  (2017) ("The FAA thus preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim.")

Other than the issue regarding arbitration fees, which is addressed below, nothing in Plaintiffs' affidavits or declarations allege the fifth factor, that the lease agreements or the arbitration clauses contained therein were substantively unfair. Further, the Tenth Circuit has held

that these types of arbitration provisions contained therein are valid and enforceable. *Adams v. Merrill Lynch*, 888 F.2d 696, 700 (10th Cir. 1989) ("There is certainly nothing inherently unfair about the arbitration clauses, and they are therefore valid and enforceable.")

The sixth factor looks at the relationship between the parties, including factors of assent, unfair surprise, and notice. None of the declarants alleged that they were surprised to have to sign the lease agreements before performing at the clubs or were surprised by the content of the agreements. Further, Plaintiffs do not allege that anyone made false or misleading statements about the contract. [Dkt. 106] Ex. 1-12. Nearly all declarants stated that they signed the agreements because they wanted to perform at the club. *Id.*

The remainder of the declarants' allegations regarding the lease agreements and the arbitration agreements can be argued only under the seventh factor, which looks at all of the circumstances surrounding the formation of the contract. Plaintiffs attempt to combine the different circumstances alleged in each declaration to paint a generalized picture of procedural unconscionability, when in reality the individual allegations do not suffice to hold the lease agreements or arbitration clauses unenforceable. For example, Plaintiffs allege that they "often had at least a few drinks before signing the contract…" [Dkt. 105], p. 9, but none of the Plaintiffs allege that they were visibly intoxicated when they signed their agreements or that they were so intoxicated they could not understand the agreement.

Plaintiffs also allege, in a general manner, that they were not allowed to take the lease agreements home before signing…" [Dkt. 105], p. 10.  However, none state how asking for a copy of the agreement or failing to receive it would affected the enforceability of the agreement or

changed their decision whether to execute additional agreements. [Dkt. 106-1, ¶12, Dkt. 106-4 ¶ 17; Dkt. 106-5 ¶ 34, Dkt. 106-9 ¶ 13]. Many entertainers did receive copies of their contracts.

Plaintiffs also argue different reasons that contributed to their inability to read or understand the contract, including learning disabilities, English being a second language, and being easily distracted by the lights and music in the club. None alleged that all of these factors limited their understanding of the agreement. Only one Plaintiff alleged that she suffered from ADD and ADHD. [Dkt. 106-10, ¶ 7]. However, she does not allege that English was her second language or that the lights and music distracted her. Only Santich alleges that she had a hard time understanding the contract because English was her second language. [Dkt. 106-1, ¶ 3]. She does not allege that she has any type of learning disability or that she could not read the agreement. [Dkt. 106-1]. Further, only one declarant alleged that she was too distracted by the lights and music in the club to fully understand the contract. [Dkt. 106-4, ¶ 5]. She does not allege that she has a learning disability or that English was her second language. Other than wanting to perform, none explain why they signed the agreements in where they claim they lacked an understanding of them.

To the extent Plaintiffs allege that they were forced to wear lingerie (their dance uniforms), Plaintiffs provided no authority demonstrating that the parties' attire contributes to the unconscionability of the agreement. Moreover, none of the Plaintiffs allege that they asked to change and were denied that opportunity.  [Dkt. 106-1-12]. Nor do Plaintiffs allege that they expected to be able to put their street clothes back on after they auditioned even though they planned to work after signing their agreements. *Id.*  In any event, the declarants were contracting to perform as exotic dancers performing nude or semi-nude. Again, other than wanting to perform at the club, none explain why they signed the agreements if they were uncomfortable doing so.

11

Taken individually, not one of the named declarants allege facts to sufficiently establish the lease agreement unconscionable. Plaintiffs' attempt to combine the experiences of twelve different entertainers into one general image of unconscionability is misleading and should be disregarded. Because Plaintiffs have failed to show that the arbitration clauses were both procedurally and substantively unconscionable for each declarant, they have failed to show unconscionability and should be compelled to arbitrate their claims. *Vernon,* 857 F. Supp., at 1157.

### C.    The Fee Provisions in the Arbitration Clauses Are Not Unconscionable.

Plaintiffs' argument that the arbitration clause is substantively unconscionable due to the cost burden placed on litigants fails as well. First, cost splitting and shifting provisions within arbitration agreements may render a case not worth pursuing, but it does not *eliminate* one's right to pursue the claim. *Am. Express Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2310-2312 (2013) (emphasizing that the law does not guarantee an affordable procedural path the vindication of every claim). In order to show that the arbitration costs would be so prohibitive to render the arbitration agreement unconscionable, plaintiffs must show that they were *prohibited* – on the basis of costs and means – from arbitration. *Nesbitt v. FCNH, Inc.,* 811 F. 3d 371, 379-80 (10th Cir. 2016) (plaintiff demonstrated that arbitration would be prohibitively expensive by providing the court with an estimate of the costs she would incur).  Here, Plaintiffs have not provided an estimate of the costs they believe they would incur if they pursued their claims individually in arbitration, nor have many explained their total annual income and expense and why they could not pursue arbitration.[6] Therefore the court does not have any way of assessing whether the costs would be

---

[6] Without sufficient evidence to support their assertion that the arbitration costs prevent them from vindicating their statutory rights, plaintiffs fail their burden. *Torgerson v. LCC Int'l, Inc.,* 2017 U.S. Dist. LEXIS 955, *19-20, 2017 WL 25387 (D. Kan. Jan. 3, 2017), (plaintiff failed to meet his burden of proof because he "offered absolutely no evidence to support his claim that the costs of arbitration will deny him an effective forum to vindicate his statutory

*prohibitive.* Moreover, many entertainers have stated that cost is not a prohibitive factor for them when deciding whether or not to file suit against Defendants, they just don't have any issues with the business relationship. *See* Ex. H, ¶ 25; see also, Ex. I, ¶ 21; Ex. J, ¶ 24; Ex. K, ¶ 22; Ex. L, ¶ 23; Ex. M, ¶ 23; Ex. N, ¶ 23; Ex. O, ¶ 23; Ex. P, ¶ 23; Ex. Q, ¶ 22; Ex. R, ¶ 22; Ex. S, ¶ 22; Ex. T, ¶ 25; Ex. U, ¶ 23; Ex. V, ¶ 24; Ex. W, ¶18.

Additionally, contrary to the arbitration clause in *Nebsitt,* the arbitration clause here contains a "savings clause" and is therefore severable. *Daugherty v. Encana Oil & Gas (USA), Inc.,* 2011 U.S. Dist. LEXIS 76802, at \*34-35 (D. Colo. July 15, 2011) (fee splitting provision of arbitration clause is severable where arbitration clause contains savings clause). The fee provision of the arbitration clause provides that "[t]he costs of arbitration shall be borne equally by the entertainer and the club unless applicable law requires the arbitrator to impose a different allocation."[7] The lease also permits the arbitrator to award any relief available in court. *See* Ex. G, ¶ 21 (emphasis added). These provisions allow an arbitrator to adjust the fee shifting provisions in the arbitration agreement pursuant to the FLSA, FAA, or any other applicable law. Here, the fee

---

rights") (citations omitted). *E.g., Zambrano v. Strategic Delivery Sols., LLC,* 2016 U.S. Dist. LEXIS 130533, 2016 WL 5339552, at \*8-9 (S.D.N.Y. Sept. 22, 2016) (holding that plaintiffs had not satisfied their burden to show that the arbitration agreement was unenforceable because plaintiff's claims of prohibitive costs were too speculative); *Leonard v. Del. N. Cos. Sport Serv., Inc.,* 2016 U.S. Dist. LEXIS 89295, 2016 WL 3667979, at \*4 (E.D. Mo. July 11, 2016) (holding that plaintiff failed to carry his burden to show that arbitration was cost prohibitive because "he has provided no evidence of the specific costs or arbitration fees or his financial inability to afford [ ] them"); *Monteverde v. W. Palm Beach Food & Beverage, LLC,* No. 9:15-CV-81203, 2016 U.S. Dist. LEXIS 38649, 2016 WL 1161224, at \*6 (S.D. Fla. Mar. 23, 2016) (distinguishing *Nesbitt* because it was "decided in the context of *evidence* that the individual plaintiff was prohibited—on the basis of costs and the plaintiff's means—from arbitration: but plaintiffs "failed to provide any notable or credible evidence of the same in this case")

[7] The crux of Plaintiffs' argument is that they were classified as a non-employee, but because the defendant exercised too much control, in actuality they were statutory employees under the FLSA entitled to the payment of minimum wage and overtime. Of course, the protections of the FLSA only apply to employees. A properly classified independent contractor or other non-employee is not subject to the FLSA or the cost shifting recovery contained in 29 U.S.C. 216(b). In other words, until the arbitrator determines that the Plaintiffs were statutory employees entitled to the protection of the FLSA, the argument prohibiting the payment of costs and fees does not apply. Until such time, the argument is nothing more than red hearing.

provisions of the FLSA would apply instead of those set forth in the arbitration clause. For these reasons, the arbitration clause should not be rendered unconscionable, but the fee provision stricken from the agreement if the court determines the costs and fees section would prohibit Plaintiffs from asserting their legal rights.[8]   If the Court determines that the fee provision is unconscionable, the severability clause prevents the fee provision from rendering the entire arbitration clause unconscionable. *Daugherty v. Encana Oil & Gas (USA),* 2011 LEXIS 76802, at *34-35; *see also McGrew*, 2017 U.S. Dist. LEXIS 43963 at * 25 (finding that the cost-sharing and fee-shifting provisions were readily severable from the substantive provisions of the agreement). In any event, if this Court determines the fee provision would render the arbitration clause unconscionable, Defendants agree to pay the arbitration fees of any arbitration proceeding that the entertainers would not incur in Court.

### D.   Entertainers Knowingly Entered Into Agreements With Defendants.

Entertainers from five Denver clubs along with an entertainers from Indianapolis and Portland, Maine provided declarations that directly contradict Plaintiffs' declarations. With regard to the first factor of unconscionability, many entertainers have said that although they were routinely presented with a standard agreement, they always felt like they had the ability to negotiate the contract if they wanted to. Ex. J, ¶ 8; *see also* Ex. K, at ¶ 7; Ex. L, at ¶ 8; Ex. H, at ¶ 8; Ex. O, ¶ 7; Ex. L, ¶ 8; Ex. Z, ¶ 8; Ex. AA, ¶ 8; Ex. BB, ¶ 8; Ex. CC, ¶ 10; Ex. DD, ¶ 8; Ex. H, ¶ 8; Ex. EE, ¶ 8; Ex. P, ¶ 8; Ex. Q, ¶ 8; Ex. T, ¶ 9; Ex. V, ¶ 8. Further, many managers have also stated that they would allow potential entertainers to negotiate some of the contract terms. Ex. FF, ¶ 15; Ex.

---

[8] Chavez signed her last entertainer lease on January 26, 2013. That lease provided for the Club, not the entertainer, to pay the fees and costs associated with arbitration of an employment related claim and expressly precludes fee shifting. See Exhibit. X, ¶ 21. Shafer's last agreement contains identical terms. (Exhibit Y, ¶ 21).

GG, ¶ 15; Ex. HH ¶ 14; Ex. II, ¶ 13, Ex. JJ, ¶ 13; Ex. KK, ¶ 16; Ex. LL, ¶ 16; Ex. MM, ¶ 16; Ex. NN, ¶ 16; Ex. OO, ¶ 16; Taylor, ¶ 16; Ex. QQ, ¶ 16; Ex. RR, ¶ 15; Ex. SS, ¶ 15;Ex. TT, ¶ 16.

With regard to the second factor, entertainers stated that they had plenty of time to read the agreements. "The managers really emphasized with me that if I wanted more time to review the agreement I could take it home, or I could have someone else review it" Ex. L, ¶¶ 10, 6; see also, Ex. H, ¶ 6; Ex. I, at ¶ 6; Ex. K, ¶¶ 5, 9; Ex. J, ¶ 5; Ex. UU, ¶6.  Some took them home to review, while others reviewed and signed the same day that they received it.  Ex. EE, ¶ 6; Ex. Q, ¶ 6; Ex. S, ¶ 6; Ex. V, ¶ 6.[9]

As to the third factor, Plaintiffs do not allege that the arbitration provision was hidden or hard to find within the agreement. Several entertainers remembered reading the arbitration provisions when they reviewed the contract. "I remember reading the arbitration clause. It seemed self-explanatory. I did not ask any question[s] about it." Ex. J, ¶ 18; see also, Ex. L, ¶ 17; Ex. K, ¶ 16; Ex. VV, ¶ 19; and Ex. O, ¶ 17.  Defendants did not hide the arbitration clauses in any way or included them as the "fine print of the agreement." In fact, the arbitration clause is always bolded text in the agreements. *See* Ex. G.

As to the fourth factor, Defendants informed the entertainers of the difference between being an employee and an independent professional contractor: "The first time I was presented with an agreement… the manager went over both what it meant to be an employee and an independent contractor." Ex. I, ¶ 5. Many managers stated this is a standard part of the process. Ex. WW, ¶ 5; Ex. XX, ¶ 5; Ex. HH, ¶ 5; Ex. YY, ¶ 5; Ex. ZZ, ¶ 5; Ex. II, ¶ 5; Ex. JJ, ¶ 5;  Ex. KK,

---

[9] No declarants state the amount of time they were provided to review the agreement. Rather, they aver to being left alone to review the contract (Dkt. 106-1, ¶ 4 and Dkt. 106-4, ¶ 5) Others had the contract explained to them (Dkt. 106-2, ¶ 4, Dkt. 106-7, ¶ 7, Dkt. 106-4, ¶ 15, Dkt. 106-9, ¶ 4, Dkt. 106-10, ¶ 6, Dkt. 106-11, ¶ 5)

¶ 5; Ex. LL, ¶ 5; Ex. MM, ¶ 5; Ex. AAA, ¶ 5; Ex. NN, ¶ 5; Ex. OO, ¶ 5; Taylor, ¶ 5; Ex. QQ, ¶ 5; Ex. RR, ¶ 5; Ex. SS, ¶ 5; Ex. BBB, ¶ 10; Ex. QQ, ¶ 5.

"The I[PE] agreement allowed me to keep more money that I earned and wear whatever I want." Ex. K, ¶ 4. "I chose to perform as an independent contractor because I believed then as I continue to believe today, that it provides me with significant flexibility and is more lucrative…" Ex. GGG, ¶ 8; Ex. VV, ¶ 6; Ex. CCC, ¶ Ex. Z, ¶ 5; Ex. DDD, ¶ 6; Ex. AA, ¶ 5;Ex. EEE, ¶ 6; and Ex. CC, ¶ 7.  One entertainer stated "I chose to be an independent contractor because it allows me to have a flexible schedule so that I can care for my ill mother." Ex. FFF, ¶ 5.

With regard to notice of the new contracts, the clubs typically post notice a month before the entertainers have to have their contracts signed, allowing the entertainers plenty of time to review and sign the new agreement.  Ex. CC, ¶ 16; Ex. H, ¶ 14; Ex. N, ¶ 15; Ex. M, ¶ 14; and Ex. Q, ¶ 13. Thus, the agreements were commercially reasonable. [10]

As to the fifth factor, many of the entertainers did not have any issues with the contracts upon reviewing them. Ex. I, ¶ 8; *see also*, Ex. J, ¶ 9; Ex. GGG, ¶ 10; Ex. VV, ¶ 5; Ex. CCC, ¶ 5; Ex. FFF, ¶ 6; Ex. HHH, ¶10; Ex. N, ¶ 8; Ex. M, ¶8; Ex. I, ¶ 8; Ex. III, ¶ 8; Ex. JJJ, ¶ 8. They fully understood the agreement, and if they had questions they would ask. Ex. J, ¶ 9; Ex. H, ¶ 9; Ex. L, ¶ 9; Ex. K, ¶ 8; Ex. I, ¶ 9; Ex. KKK, ¶12.  Further, if the Entertainers felt that any of the terms of the agreement were unfair, they did negotiate them at the time, or the attended the annual meeting

---

[10] In fact, since 2010, Defendants advised entertainers in writing of both the terms that they were willing to offer them employment and the terms under which they were willing to contract with them. See [Dkt.20]. As the declarants explained, they chose to be Independent Professional Entertainers, not employees because the terms under which the respective defendant was willing to employ them.  See e.g. [Dkt. 106], Ex. 4 ¶ 15, Ex. 9 ¶ 5 (working as an employee sounded horrible), Ex. 11, ¶ 10, and Ex. 12, ¶ 5.

where they could speak as a group to the management about them. Ex. K, ¶ 7; Ex. L, ¶ 8; Ex. O, ¶ 7.

The sixth factor looks at the relationship between the parties. First, contrary to Plaintiffs' assertions the entertainers were not forced to be in their dance wear when they signed the agreements, but they often chose to be because they would have just auditioned or were going to work immediately after signing the agreements. Ex. H, ¶ 4; Ex. J, ¶ 3; Ex. L, ¶ 3; Ex. K, ¶ 3; Ex. I, ¶ 4; Ex. O, ¶ 3; Ex. N, ¶ 3; Ex. M, ¶ 4.[11]  Second, Plaintiffs' allegations that managers would rush them or refuse to answer questions regarding the agreements is directly contradicted by the experiences of many other entertainers. Ex. I, ¶ 6; Ex. J, ¶¶ 4, 7; Ex. L, ¶¶ 5, -7; Ex. K, ¶ 5; Ex. H, ¶¶ 6-7; Ex. M, ¶ 7; Ex. N ¶¶ 5-7; Ex. O, ¶¶ 5-7; Ex. GGG, ¶ 7; Ex. VV, ¶ 7; Ex. CCC, ¶ 8; Ex. O, ¶ 5; Ex. Z, ¶ 6; Ex. DDD, ¶ 12; Ex. LLL, ¶ 6. Third, the entertainers never felt intimidated by management. "At no time did I feel intimidated by a manager." Ex. H, at ¶ 7; *see also* Ex. J, at ¶ 7; Ex. L, at ¶ 7; Ex. K, at ¶ 6; Ex. I, at ¶ 7; Ex. GGG, ¶ 7, Ex, VV, ¶ 8; Ex. CCC, ¶ 7; Ex. O, ¶6; Ex. Z, ¶ 7; Ex. AA, ¶ 7; Ex. BB, ¶ 6;Ex. DD, ¶ 7; Ex. HHH, ¶9; Ex. H; 7.

To support their arguments under the seventh factor that addresses all of the other circumstances surrounding the agreement, Plaintiffs allege that they agreed to their contracts in an unfair setting and that the contract's purpose was not fair. Contrary to Plaintiffs' allegations, the circumstances under which they signed are fair and reasonable: "I never had an alcoholic beverage before signing the agreement. Floyd, the manager, would not let me sign a contract if he knew I had been drinking." Ex. K, ¶ 14; *see also*, Ex. L, ¶ 14; Ex. J, ¶ 15; Ex. I, ¶ 13; Ex. H, ¶ 15; Ex. O, ¶ 14; Ex. N ¶ 18. "My highest level of education is high school. This did not hinder my

---

[11] Wearing lingerie and appearing either nude or semi-nude is what the entertainers wore at "work."

understanding of the agreement." Ex. H, ¶ 13; Ex. I, ¶ 12; Ex. J. ¶ 13; Ex. K, ¶ 12; Ex. L ¶ 12; Ex.

M, ¶ 13; Ex. N, ¶ 12. "Each time I have signed an agreement I was in the office. The lighting and

music in the building did not hinder my understanding of the agreement." Ex. L, ¶ 15; see also,

Ex. H, ¶ 16; Ex. I, ¶ 14; Ex. J, ¶ 16; Ex. K, ¶ 15; Ex. M, ¶ 16; Ex. N, ¶ 16; Ex. O, ¶ 15. "At no time

did anyone with management at the Club misrepresent the terms of the Entertainer Agreement to

me." Ex. H, ¶ 11; *see also*, Ex. I, ¶ 11; Ex. J, ¶ 11; Ex. K, ¶ 10; Ex. L, ¶ 11; Ex. M, ¶ 11; Ex. N, ¶

11; Ex. O, ¶ 10.

In short, Plaintiffs fail to show that the independent contractor agreements containing

arbitration clauses are unconscionable. Plaintiffs' allegations, in many important respects, directly

conflict with the experiences of more than thirty entertainers from all five of the different Denver

clubs, proving that the agreements are conscionable and enforceable.

## IV.   VCG AND LOWRIE CAN ENFORCE THE ARBITRATION CLAUSE

While courts generally have the authority only to compel arbitration between signatories,

"the FAA does not 'alter background principles of state contract law regarding the scope of

agreements (including the question of who is bound by them).'" *MSPBO, LLC v. Garmin Int'l,*

*Inc.*, 2014 U.S. Dist. LEXIS 127312, at *10 (D. Colo. Sep. 11, 2014) (quoting *Arthur Andersen*

*LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009)). Contracts can be enforced by non-parties through

traditional principles of state law, including equitable estoppel.  *Arthur Andersen,* 556 U.S. at 631.

In Colorado, equitable estoppel applies to claims which "presume the existence" of the

agreement, and in claims which allege "interconnected and concerted misconduct between the non-

signatory and one or more of the signatories related to that agreement." [12]   *Meister v. Stout*, 353 P.3d 916, 918 (Colo. App. 2015); *see also Pollard v. ETS PC, Inc.,* 186 F. Supp. 3d 1166, 1174 (D. Colo. 2016) (adopting the holding of *Meister*).   The presence of either factor is sufficient to compel arbitration, both of which apply in this case.  *See Meister*, 353 P.3d at 921-22.

### A.      Plaintiffs' Complaint Relies on the Lease Agreements.

Equitable estoppel applies when "a signatory must rely on the terms of a written agreement containing an arbitration agreement to assert its claims against a non-signatory." *Id.* at 921.  "A signatory relies on the agreement when it *references or presumes* the existence of the written agreement containing the arbitration agreement." [13]  *Id.* (emphasis added).  In *GATX Mgmt. Servs. LLC v. Weakland,* 171 F. Supp. 2d 1159, 1166 (D. Colo. Nov. 14, 2001), a "misappropriation of trade secrets claim presume[d] the existence of the Employment Agreement," otherwise the plaintiff would not have been employed by the defendant and would not have had access to the trade secrets. *See also, e.g., Meister* (applying arbitration provision to non-signatories because the claims against the non-signatories were premised upon the contract with the arbitration provision).

Here, Plaintiffs' First Amended Complaint references the existence of the written agreement.  Plaintiffs explicitly refer to "the provisions in the contracts the Defendants required Plaintiff and other Class members to sign."  Amended Compl. ¶ 90.  Plaintiffs reference the lease

---

[12] Plaintiffs cite *Peck v. Encana Oil & Gas, Inc.*, 2016 U.S. Dist. LEXIS 180767, at *5 (D. Colo. Dec. 16, 2016) (unpublished), for the proposition that in order for equitable estoppel to apply, the plaintiff must have attempted to both hold the defendant liable under the terms of the agreement, and simultaneously denied that the arbitration agreement applied because they were non-signatories.  [Dkt. 105, p. 5].  Plaintiffs' reliance on *Peck* is misplaced. *Peck* addresses when a signatory defendant is compelling a non-signatory plaintiff to arbitrate his or her claims. *Peck,* 2016 U.S. Dist. LEXIS 180767 at 3, 9.  Here, the non-signatory parties are two of the defendants who are seeking to compel the Plaintiffs (signatory parties) to arbitrate their claims.  Thus, *Peck* is inapplicable. .

[13] Plaintiffs claim in a conclusory manner that they "do not rely on the Lease in formulating their claims," and cite *Meister* to support their claim.  **[Dkt. 105, p. 5].**  Their assertion ignores the clear definition which *Meister* gives to "rely." *Meister,* 353 P.3d at 921 (A signatory relies on the agreement when it *references or presumes the existence of the written agreement* containing the arbitration agreement) (emphasis added).

again in the following paragraph.  *Id.* ¶ 91.  Like in *Meister,* Plaintiffs incorporate the background into each of their claims.  *Id.* ¶¶ 125, 143, 158, 162, 174, 191.

Furthermore, despite Plaintiffs' claims to the contrary, the claims do arise from Plaintiffs' rights and Defendant's obligations under the lease.  Plaintiffs' Complaint includes ten allegations that they were improperly classified as independent contractors.  Amended Compl. [Dkt. 65], ¶¶ 8, 10, 12, 20, 41, 104, 105, 117, 159, 163.  However, each Plaintiff made the informed decision to be an independent contractor and reviewed the terms of the lease agreement which they now challenge.  *See, e.g.,* Amended Comp. ¶¶ 24 (the payment of "House Fees"), 28 (payout of rent).  Moreover, each agreement included any persons or entities associated with the club as a signing party to the contract. [14]  For a complaint to rely on the underlying contract it need only "reference" or presume" the existence of the agreement containing the arbitration clause.  *Meister*, 353 P.3d at 921.  Here, Plaintiffs' complaint both references and presumes the existence of the leases.  Therefore, Plaintiffs claims against a non-signatory, are subject to arbitration.

### B.    Plaintiffs Allege Interconnected Misconduct Between the Defendants

Equitable estoppel applies when "a signatory alleges substantially interdependent and concerted misconduct by a non-signatory and one or more signatories under the agreement."  *Id.*; *see also GATX,* 171 F. Supp. 2d at 1166 ("Numerous other courts have held that equitable estoppel allows non-signatories to compel arbitration if there are intertwined claims").  The misconduct must be "intertwined with duties or obligations arising from the underlying conduct." *Meister*, 353

---

[14] In *Pollard* the court determined that because the arbitration clause in dispute required arbitration in "all claims against defendant ETS or its affiliated companies" that the non-signatories who were clearly affiliated with the signatories could compel arbitration. *Pollard,* 186 F. Supp. 3d at 1171.  As opposed to the arbitration clause in dispute in *Peck,* which referred only to the signing parties, here, like in *Pollard,* the arbitration clauses require arbitration against the club "and any other persons or entities associated with the club."  [Dkt. 74, Exhibit 5h, at ¶ 14].  Therefore, the non-signatory affiliated Defendants can compel arbitration with the signatory Defendants.

P.3d at 921. In *Pollard*, the plaintiff argued that he was seeking to hold the defendant liable under the FLSA, not under the agreement. 186 F. Supp. 3d at 1175. The court rejected this argument, and held that a plaintiff's FLSA claims are intertwined with their underlying contracts. *Id.* In *Meister*, the claims alleged interconnected and concerted misconduct when they did not assign the "alleged misconduct to any defendants individually," and asserted identical claims against all defendants. 353 P.3d at 921.

Here, Plaintiffs admit that they allege "substantially interdependent and concerted misconduct" between both the signatory and non-signatory defendants. [Dkt. 105, p. 5]. As in *Pollard*, the claims are intertwined with the duties of the contract, as the Lease lays out the terms of Plaintiffs and Defendant's relationship.[15] Like in *Meister*, the Plaintiffs do not allege that any of the Defendants acted individually. *See* [Dkt. 105]. All of the claims are identically asserted against at least one signatory and the non-signatory Defendants. *Id.; see* "First Claim for Relief," at ¶ 135 ("Defendants demanded that Plaintiffs and other Class member pay 'kickbacks'..."). Thus, as in *Meister,* the signatory Plaintiffs "allege [] substantially interdependent and concerted misconduct by a non-signatory and one or more signatories..." *Meister*, 353 P.3d at 921. Therefore, because Plaintiffs' claims rely on the written agreement and the alleged misconduct applies to all Defendants, Defendants VCG and Lowrie can enforce the arbitration clause.

## V.    THE CLASS AND COLLECTIVE ACTION WAIVER IS ENFORCEABLE

Plaintiffs argue that the class and collective action waivers are unlawful. First, absent a clearly expressed congressional intent to the contrary, the FAA and the NLRA should be

---

[15] Plaintiffs state in a conclusory manner that their FLSA claims are not intertwined with the duties or obligations from the lease, citing *Meister*. [Dkt. 105, p. 5]. However, this ignores the holding of *Pollard*, where FLSA claims were found to be intertwined with the underlying contracts because the plaintiff indiscriminately accused all of the defendants of various alleged FLSA violations. 186 F. Supp. 3d at 1175.

interpreted harmoniously. Second, the weight of authority holds that the NLRA should be interpreted to mandate enforcing class action waivers.[16] Third, the waivers are enforceable pursuant to the FLSA.

### A.    The NLRA Does Not Conflict with the FAA

Initially, unless and until the arbitrator determines that Plaintiffs are employees, they are not subject to the NLRA. *Meyer Dairy, Inc. v. NLRB*, 429 F.2d 697, 700 (10th Cir. 1970) (vacating an NLRB decision that workers could bargain because the workers were independent contractors). Even if it did apply, the NLRA and the FAA are not incompatible.  Section 2 of the FAA establishes "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.,* 460 U.S. 1, 24 (1983).  Its "purpose was to place an arbitration agreement upon the same footing as other contracts … and to overrule the judiciaries longstanding refusal to enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219-220 (1985). Section 2 requires courts to enforce agreements to arbitrate according to their terms. *CompuCredit Corp. v. Greenwood,* 565 U.S. 95,  98 (2012). An arbitration provision in a contract…shall be

---

[16] Numerous courts have concluded that the NLRA does not prohibit arbitration clauses with class waivers. *See Sutherland v. Ernst & Young*, 726 F.3d 290 (2d Cir. 2013), *Murphy Oil USA v. NLRB*, 808 F.3d 1013 (5th Cir. 2015) (*en banc* review denied May 13, 2016); cert granted, 2017 U.S. LEXIS 680, *1, 137 S. Ct. 809, 196 L. Ed. 2d 595, 85 U.S.L.W. 3344, 2017 WL 125666 (U.S. Jan. 13, 2017); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050 (8th Cir. 2013); *Cellular Sales of Missouri, LLC v. NLRB*, 2016 U.S. App. LEXIS 10002 (8th Cir. June 2, 2016); *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1336 (11th Cir. 2014); *See also, Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 80 (S.D.N.Y. 2015); *Longnecker v. American Express Co.*, 23 F. Supp. 3d 1099, 1112-13 (D. Az. 2014); *Bekele v. Lyft, Inc.*, 2016 U.S. Dist. LEXIS 104921, **55-64 (D. Mass. Aug. 9, 2016); *Fardig v. Hobby Lobby Stores, Inc.*, 2014 U.S. Dist. LEXIS 87284, 2014 WL 2810025, at *7 (C.D. Cal. 2014); *Hickey v. Brinker Int'l Payroll Co.*, 2014 U.S. Dist. LEXIS 20387, 2014 WL [*1262] 622883, at *2 (D. Colo. Feb. 18, 2014) (providing detailed analysis of why the *Lewis* decision was wrongly decided based on the text of the FLSA and Section 7 of the NLRA). However, three appeals courts have concluded otherwise. *See Lewis v. Epic Systems Corp.*, 823 F.3d 1147 (7th Cir. 2016), cert. granted 2017 U.S. LEXIS 691, *1, 137 S. Ct. 809, 196 L. Ed. 2d 595, 85 U.S.L.W. 3343 (U.S. Jan. 13, 2017), *Morris v. Ernst & Young, LLP*, 2016 U.S. App. LEXIS 15638 (9th Cir. 2016), cert. granted at 2017 U.S. LEXIS 689, *1, 137 S. Ct. 809, 196 L. Ed. 2d 595, 85 U.S.L.W. 3344 (U.S. Jan. 13, 2017), and *NLRB v. Alt. Entm't, Inc.*, 858 F.3d 393 (6th Cir. May 26, 2017). The Supreme Court has granted certiorari to resolve this conflict. A decision is expected this term.

valid, irrevocable, and enforceable, save upon such grounds exist at law or in equity for the revocation of any contract. 9 U.S.C. §2. Section 2 of the FAA renders class action waivers as "valid, irrevocable, and enforceable," unless the saving clause in the FAA applied to the NLRA.

The savings clause would only apply to the NLRA if there was a specific congressional command overriding the FAA. *Shearson/Am. Express Inc. v. McMahon,* 482 U.S. 220, 226 (1987) (like any statutory directive, the [FAA's ] mandate may be overridden by a contrary congressional command). The Supreme Court has held that the FAA requires enforcement of an arbitration clause even where the federal statute that provided the cause of action dictated otherwise. *See Scherk v. Alberto-Culver Co.,* 417 U.S. 506 (1974) (enforcing arbitration under the FAA where the Securities Exchange Act gave federal district courts "exclusive jurisdiction" over such suits). Commonly, the Court will ask whether "Congress itself," in enacting the statute that created the plaintiff's cause of action, "evinced an intention to preclude" enforcement of the parties' agreement. *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991).  In both *Scherk* and *Gilmer* and several other cases, the Court found that Congress did not speak with the necessary specificity to indicate an intention to preclude the parties' arbitration agreements and override the FAA. *See e.g., Green Tree Fin. Corp. –Ala. v. Randolph,* 531 U.S. 79, 89-92 (2000) (Truth in Lending Act); *Gilmer,* 500 U.S. at 26-33 (Age Discrimination in Employment Act of 1967); *McMahon,* 482 U.S. at 227-242 (Securities Exchange Act of 1934 and Racketeer Influenced and Corrupt Organizations Act); *Mitsubishi Motors v. Soler Chrysler-Plymouth,* 473 U.S. 614, 628-629 (1985) (Sherman Act)**.**

The NLRA does not contain a specific congressional command precluding enforcement of Plaintiffs' arbitration agreements. Although the FLSA authorizes suit "by any one or more

employees for and in behalf of himself or themselves and other employees similarly situated," 29

U.S.C. 216 (b), that provision is not different from other "utterly commonplace" provisions that

"describe the details of…causes of action, including the relief available, in the context of s court

suit, *"CompuCredit,* 565 U.S. at 100. "[M]ere formulation of the cause of action" is not sufficient

to establish a congressional command that overrides the FAA. *Id.* at 100-101 (citations omitted).

### B.     Arbitration Does Not Conflict with the FLSA.

The FLSA only applies to employees, not licensees or independent contractors.  *See Freund*

*v. Hi-Tech Satellite, Inc*., 185 Fed. Appx. 782, 782 (11th Cir. 2006).  The right to pursue a collective

action under 29 U.S.C. 216(b) is a procedural rather than substantive FLSA right. A "class action

waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties'

rights to pursue a statutory remedy that did federal law before its adoption of the class action for

legal relief in 1938." *Italian Colors,* 138 S. Ct. at 2311.  Any agreement not to proceed collectively

"leaves the parties' legal rights intact, and the rules of decision unchanged. *Shady Grove*

*Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 408 (2010). [17]

Plaintiffs' argument that the class action waivers inherently conflict with the FLSA's

purpose of "protecting the class of employees that possess the least bargaining power in the

workforce: 'the unprotected, unorganized, and lowest paid of the nation's population." [Dkt. 105

---

[17] The overwhelming weight of persuasive authority supports the conclusion that arbitration is not inconsistent with the FLSA. Each circuit court to address this issue has concluded that the FLSA does not contain the "contrary congressional command" necessary to override the FAA's mandate. *McGrew v. VCG Holding Corp*., 2017 U.S. Dist. LEXIS 43963, *18 (W.D. Ky. Mar. 27, 2017), citing *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1334 (11th Cir. 2014); *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 296 (2d Cir. 2013); *Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052 (8th Cir. 2013); *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002).

p, 27] (citations omitted), is inapplicable here. Here, the Plaintiffs knowingly agreed to waive their right to pursue a class action after reading and understanding the provisions of the agreements.

## CONCLUSION

The arbitrator alone should decide the enforceability of the lease agreements, as Plaintiffs have challenged the formation of the entire agreements.  In any event, Defendants have shown that at least 22 of the named Plaintiffs should be compelled to arbitration because they did not provide any facts to challenge their arbitration agreements. Even if they had, it is clear that the agreements are not procedurally or substantively unconscionable as to any of the named Plaintiffs. Additionally, any claims that Defendants VCG and Lowrie cannot compel arbitration fail because claims against them are subject to arbitration. Accordingly, the Court should grant Defendants' Motion to Stay or Dismiss the Proceedings in this case.

Respectfully submitted this 10th day of July, 2017.

JACKSON LEWIS P.C.

*s/ Ryan Lessmann*

Ryan P. Lessmann
Melisa H. Panagakos
950 17th Street, Suite 2600
Denver, Colorado 80202
Telephone: (303) 892-0404
Facsimile: (303) 892-5575
LessmannR@jacksonlewis.com
Melisa.Panagakos@jacksonlewis.com

Allan S. Rubin
2000 Town Center, Suite 1650
Southfield, MI 48075
Telephone: (248) 936-1900
Facsimile:
RubinA@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 10th day of July, 2017, a true and correct copy of the foregoing **DEFENDANT'S REPLY IN SUPPORT OF THEIR MOTION TO STAY OR DISMISS PROCEEDINGS PURSUANT TO SECTIONS 3 AND 4 OF THE FEDERAL ARBITRATION ACT, TO COMPEL PLAINTIFFS' TO ARBITRATION, AND TO STRIKE CLASS AND COLLECTIVE ACTION ALLEGATIONS** was served via CM/ECF on the following:

KILLMER, LANE & NEWMAN, LLP

Mari Newman
Darold W. Killmer
Andy McNulty
Eudoxie (Dunia) Dickey
Liana Orshan
1543 Champa St., Ste. 400
Denver, CO 80202
mnewman@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com
ddickey@kln-law.com
lorshan@kln-law.com

*ATTORNEYS FOR PLAINTIFFS*

*s/ AuCamya M. Parish*
for Jackson Lewis P.C.